UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROGERS KELLY                                    CIVIL ACTION

VERSUS                                          NUMBER: 10-1198

MICHAEL J. ASTRUE,                              SECTION: "F"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 9, 13).

Rogers Kelly, plaintiff herein, filed the subject application for DIB on October 3, 2008, alleging disability as of November 28, 2005. (Tr. pp. 88-94).  In an undated Disability Report that was presumably completed around the time that he applied for DIB, the conditions resulting in plaintiff's inability to work were

identified as an on-the-job injury to his right dominant hand and diabetes. (Tr. pp. 118-125). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on December 4, 2008. (Tr. pp. 44-47). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on July 28, 2009 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 49, 15-41). On August 14, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 5-14). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision on March 5, 2010, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-4). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1.  [t]he Administrative Law Judge failed to consider awarding a closed period of disability.

2.  [t]he Administrative Law Judge failed to consider whether claimant was capable of both obtaining and maintaining employment as required by the United States Court of Appeals Fifth Circuit decision in *Watson v. Barnhart*.

3.  [t]he Administrative Law Judge failed to articulate a

rationale for discounting claimant's credibility.

4.   [t]he Administrative Law Judge failed to give proper
     consideration to the significance of claimant's
     diminished manipulative ability in his dominant hand.

5.   [t]he Commissioner failed to sustain the burden of
     establishing that there is other work in the national
     economy Mr. Kelly can perform considering his age,
     education and past work experience.

6.   [t]he ALJ failed to ask the vocational expert about
     potential conflicts with the Dictionary of Occupational
     Titles.

7.   [t]here is a lack of substantial evidence supporting the
     conclusion that there are "significant numbers" of jobs
     Mr. Kelly can perform.

                                        (Rec. doc. 10-1, p. 2).

     Relevant to the issues to be decided by the Court are the

following findings that were made by the ALJ:

1.   [t]he claimant meets the insured status requirements of
     the Social Security Act through December 31, 2010.

2.   [t]he claimant has not engaged in substantial gainful
     activity since November 28, 2005, the alleged onset date
     (20 CFR 404.1571 et seq.).

3.   [t]he claimant has the following severe impairments:
     diabetes mellitus; and, interphalangeal arthritis of the
     right hand, status-post crush injury with repair (20 CFR
     404.1520(c)).

4.   [t]he claimant does not have an impairment or combination
     of impairments that meets or medically equals one of the
     listed impairments in 20 CFR Part 404, Subpart P,
     Appendix 1 (20 CFR 404.1525 and 404.1526).

5.   [a]fter careful consideration of the entire record, the
     undersigned finds that the claimant has the residual
     functional capacity to perform light work as defined in

3

20 CFR 404.1567(b) except no fine manipulation with the right dominant hand and, granting him the benefit of the doubt, no concentrated exposure to temperature extremes.

6.    [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    [t]he claimant was born on August 10, 1967 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).

8.    [t]he claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    [t]ransferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.   [t]he claimant has not been under a disability, as defined in the Social Security Act, from November 28, 2005 through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 10, 12, 13).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v.

4

Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).  Once

5

the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.
>
> 5.  if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the

claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).   Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing that was held on July 28, 2009, plaintiff was 41 years of age, had attended school through the eleventh grade, and had past relevant work experience as a machine operator, fast food worker, and barge cleaner. Standing at 5'8" tall, plaintiff weighed 210 pounds, having reportedly lost 35 pounds since 2005 due to his diabetes. Plaintiff testified that he became disabled on November 28, 2005 when his hand got stuck in a conveyor belt at the cement company where he worked, crushing his hand. That accident left plaintiff with numbness in the tips of the index, middle, and ring fingers of the right hand as well as "knobs" which grew on the bottom of the hand that were painful when picking up objects.   Plaintiff had driven himself to the hearing and,  although he sometimes had problems gripping the steering wheel with his right hand, he admitted that he could drive with his left hand.   Plaintiff estimated that he drove approximately 14 days out of any given

7

month.

Continuing, plaintiff testified that he also experienced problems with his back as a result of skin graft surgery to the right side of his body that was done in connection with his work-related accident. Ultimately, plaintiff received a workers' compensation settlement for the incident which he used to contribute to the running of the household with his fiancé. Plaintiff had never seen a doctor for his back issues and he was still able to move the fingers that were most affected by the accident. The pain to the knobs on plaintiff's right hand varied day-to-day for which his doctor had advised him to take Tylenol for relief which helped "[s]omewhat, but not really." Plaintiff had last seen a doctor for his right hand in 2007 or 2008. He could dress himself mainly using his left hand and could write legibly with the right hand and sign his own name. Plaintiff sometimes used warm water to relieve the stiffness in his right hand. He also complained of pain to the lower back after sitting for 15 to 30 minutes but he had no problems with standing or walking. Plaintiff had lifted objects weighing 10 to 15 pounds with his injured hand, albeit with pain, and gripping with the right hand also elicited pain. There were no limitations associated with the left hand.

Plaintiff testified that an average daily routine consisted of

rising in the morning, exercising, and then walking to his ill mother's home which was 4 to 5 blocks away where he would visit for anywhere from 3 to 5 hours.  He would then proceed home and watch TV.   Plaintiff testified that he did not cook although he was capable of making sandwiches and using a microwave oven.   He further testified that his nephew did the yardwork and took out the garbage and that his fiancé typically did the household chores, laundry, and grocery shopping although plaintiff acknowledged that he was physically capable of performing such functions if he had to.   Free time was spent watching sporting events or walking for exercise.   Plaintiff  indicated that he periodically saw a doctor to monitor his diabetes and hypertension, for which he respectively took Metformin and Lisinopril, but that he had not seen a doctor for his hand since being discharged in 2007.   Plaintiff did not have a primary care physician and he had not received medical care at an emergency room.   When asked why, for example, he would be unable to work as a receptionist, plaintiff testified that his prescribed medication made him drowsy and in need of a nap. (Tr. pp. 17-32).

Upon being tendered to his attorney for additional questioning, plaintiff testified that his daily naps were typically 2 hours in duration.   At the request of counsel, plaintiff proceeded to demonstrate the gripping ability in his right hand as

9

compared with the left and his middle finger was noted to be out of line with the other fingers unless he physically moved it. Numbness in the tips of the index, middle, and ring fingers of the right hand caused pain and limitations in gripping as did the knobs growing under the bottoms of plaintiff's fingers.  Since being involved in the accident, plaintiff had begun using his left hand more which had become stronger than his dominant right hand.  His penmanship with the right hand was poor but was nevertheless legible.  In terms of lifting capabilities, plaintiff testified that he could lift a glass of water and slide a coffee maker along a counter top and he once injured the top of his hand by unintentionally brushing it up against some bricks and not knowing it.  Due to his diminished gripping ability, plaintiff estimated that he was known to drop objects at a rate of 4 to 6 times per week.  The drug that was responsible for plaintiff's drowsiness was identified as Metformin. (Tr. pp. 32-36).

Karen Harrison, a VE, was next to take the stand.  She first testified that plaintiff's past jobs as a machine operator, fast food worker, and barge cleaner all involved unskilled work that was respectively performed at the heavy, light, and medium exertional levels.  The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who had the residual functional capacity for light work

with postural maneuvers being limited to frequently, no fine manipulation with the right hand, and a need to avoid concentrated exposure to heat and cold.   Presented with that hypothetical question, the VE testified that the individual described therein would be unable to perform plaintiff's past work. However, the individual would be able to work as a courier, driver, security monitor, information clerk, amusement park attendant, or meter reader, with significant numbers of such jobs existing in the national and local economies.   To the hypothetical question as originally framed, the ALJ then added concentration difficulties such that the person would be capable of only simple, repetitive job tasks.   In answer to the hypothetical question as amended, the VE testified that the courier, driver, and meter reader jobs would all be eliminated because of the driving requirement, that the available security monitor jobs would be reduced by 30%, and that the pool of available information clerk positions would be reduced by 20%.   However, if the individual was unable to concentrate for blocks of 2 hours at a time, none of the identified jobs could be performed. (Tr. pp. 36-39).   Upon being questioned by plaintiff's counsel, the VE testified that a marked restriction in the dexterity of the right hand would not erode the available occupational base of the jobs she had identified. (Tr. pp. 39-41).

As he testified to at the administrative hearing, on November

11

28, 2005, plaintiff was involved in a workplace accident in which his right hand became lodged in a conveyor belt.  He was initially treated at the Ochsner Foundation Hospital emergency room  and, following consultation with Dr. McConnell, the decision was made to admit him to the hospital for emergency surgery.  Injuries included full thickness avulsion of the skin of the dorsum of the dominant right hand, open fractures of the ring and middle fingers, and nailbed injuries to the index, middle, and ring fingers.  Plaintiff subsequently underwent surgery at the hands of Dr. Jefferson Kaye which involved debridement and irrigation of the affected areas, repair of the nailbeds, and treatment of the open fractures by way of a skin graft. (Tr. pp. 197-200, 173).  Plaintiff was discharged home 2 days later on November 30, 2005. (Tr. p. 196).

He returned to Dr. Kaye for follow-up care and to have his dressings changed on December 5, 2005.  The groin flap was noted to have good color without venous congestion and there was no sign of infection.  Plaintiff was scheduled for further skin graft surgery on December 22, 2005. (Tr. p. 192).  Plaintiff was seen again by Dr. Kaye on December 14, 2005 for complaints of sleepless nights and pain and stiffness to his fingers.  He was prescribed antibiotics and pain and sleeping pills.  His fingertip wounds were re-dressed at that time. (Tr. p. 191). Plaintiff underwent further surgery at the hands of Dr. Kaye on December 22, 2005 which

12

included a dressing change, a take-down of the groin flap, and an inset of the groin flap into the hand. (Tr. pp. 194-195).

Plaintiff returned to Dr. Kaye for further follow-up care on January 2, 2006. His wounds were noted to be healing satisfactorily and he underwent light debridement in the course of the evaluation. Dr. Kaye noted that plaintiff, at that point, was not fit for any kind of gainful employment and was to undergo a course of physical therapy. (Tr. p. 190). Plaintiff was seen again by Dr. Kaye on January 9, 2006 and his wounds were still healing satisfactorily. However, he was in need of intense physical therapy to his hand which was observed to be very stiff. Pain medication was changed to Vicodin. (Tr. p. 189). Plaintiff's wounds had healed when he next saw Dr. Kaye on January 18, 2006 and his staples were removed at that time. Plaintiff was noted to have numbness over his flank and he had a small protuberant area where his groin flap had been taken. His fingers remained stiff. Plaintiff was still unfit to return to his regular job and his nurse case manager was alerted to the need for possible job retraining. (Tr. p. 188).

When plaintiff returned to Dr. Kaye on February 22, 2006, his wounds were characterized as healthy looking and healed. However, he still had significant stiffness, soreness, and weakness. The continuous passive motion machine which had been prescribed to him

was working well and plaintiff was to double the daily usage of it. Ambien was also helping plaintiff sleep and with his supply of Vicodin soon to be exhausted, he was to be switched to Naprosyn combined with over-the-counter Prilosec to counter any stomach upsetment. Plaintiff was still not fit to return to work and it was suspected that he would need to go through a work hardening program followed by a functional capacity evaluation. (Tr. p. 187). By March 27, 2006, plaintiff's wounds had improved but the scarring to his hand was significant although unavoidable. Plaintiff could not quite make a full fist but the range of motion of his fingers was improving. Additional therapy and evaluation were needed, to be followed by a reassessment. In Dr. Kaye's opinion, plaintiff did not want to return to his previous line of work. (Tr. p. 185).

Plaintiff returned to Dr. Kaye on April 12, 2006 and reported that his hand appeared unsightly. Cosmetic surgery was discussed and the complaints at this time included morning stiffness with pain, pain with therapy, and reports of feeling nodules in his fingers. Although his hand motion was  improving with the use of a splint, plaintiff was still not fit to return to work. Further evaluation and work hardening or work conditioning were contemplated as possibilities. (Tr. p. 184). Plaintiff was seen again by Dr. Kaye on April 19, 2006 and a functional capacity evaluation was tentatively scheduled for May 9, 2006. Plaintiff

14

was not expected to return to work until after that evaluation and it was noted that his employer was more than willing to provide a light duty job for him although plaintiff indicated that none really existed. (Tr. p. 161).  Following the functional capacity evaluation, it was determined that plaintiff was not able to meet the demands of his previous heavy-level job and would benefit from a work hardening program. (Tr. p. 160).

Plaintiff returned to Dr. Kaye unaccompanied on July 24, 2006 wearing his extension splint for his middle finger MCP joint where he was noted to have an extension lag.  In connection with the evaluation of this day, Dr. Kaye reviewed the physical therapist's notes which indicated that plaintiff had tolerated the therapy without any adverse side-effects and had resulted in an increased ability to grasp and oppose with the ring and little fingers.  Dr. Kaye renewed the prescription for plaintiff's therapy and an abbreviated work capacity evaluation was to be scheduled. Following that, plaintiff planned on going into business with some of his family members doing lighter duty work.  Plaintiff was not felt to be fit for heavy duties at that point in time nor was it expected that he would ever be. (Tr. p. 183).  When plaintiff was next seen by Dr. Kaye on October 18, 2006, it was noted that he had gone through a hand work hardening program through which his capabilities had increased from a light to a medium level although

he was still not fit for heavy or very heavy duties.  Plaintiff was thought to have almost reached maximum medical improvement and his shoulder and elbow were both fine as was his thumb.  However, he was still to have some degree of residual impairment and a rating in that regard was scheduled for late November.  Plaintiff was cleared for participation in a vocational rehabilitation program to truly test his abilities. (Tr. p. 182).

Plaintiff underwent chest x-rays at Ochsner on November 2, 2006 after presenting to the emergency room with complaints of blood in the sputum.  No significant abnormality was noted through the testing. (Tr. pp. 172-173).  Plaintiff returned to Dr. Kaye on November 22, 2006 who recalled that he had discharged plaintiff from his care at the time of the previous visit on October 18, 2006.  Complaints voiced that day were cold intolerance and difficulties with pain during cold weather for which the doctor recommended over-the-counter pain medications and protective clothing for his hands when he was outdoors.  Plaintiff also reported that his employer had contacted him regarding returning to work in a light to medium-duty capacity and the doctor recalled having previously cleared plaintiff to return to those levels of work activity.  Plaintiff also reported experiencing pain during the functional capacity evaluation but that was felt to result more from a lack of conditioning from simply being out of work.  Dr.

Kaye suggested that plaintiff use Tylenol or some over-the-counter pain medication as the use of prescription pain medications or anti-inflammatories was not indicated.  At the conclusion of his treatment note from that day, Dr. Kaye again reiterated his opinion that plaintiff was capable of returning to the workforce in a light to medium capacity.  Despite his employer's efforts to find him work at that level of exertion, plaintiff remained adamant that such jobs did not exist. (Tr. pp. 180-181).

On December 4, 2006, plaintiff presented to the Ochsner emergency room with complaints of generalized weakness.  Chest x-rays were taken which revealed no adverse findings. (Tr. p. 172). Plaintiff telephoned Dr. Kaye's office on January 11, 2007 and requested a prescription for pain medication which the doctor refused to issue absent an office visit.  Plaintiff eventually proceeded to the doctor's office where he presented with complaints of intermittent severe low back pain.  Upon examination, plaintiff's hand looked healthy as did his iliac crest wound; he had a full range of shoulder motion. EMG and nerve conduction studies were to be scheduled to better evaluate plaintiff's continued complaints of numbness and tingling of the index, middle, and ring fingers.  Finger flexion was virtually full but with tremors that were to addressed by a neurologist.  Plaintiff and Dr. Kaye also discussed an alternative job position that his employer

had listed as available but plaintiff was skeptical that he could perform it and was suspicious that he was simply being put in a position to be fired.  Dr. Kaye declined plaintiff's request for narcotic pain medication but did prescribe Naprosyn to be taken with Zantac or Prilosec. (Tr. pp. 178-179).

Plaintiff and his vocational rehabilitation case manager met with Dr. Kaye again on January 17, 2007 at which time plaintiff expressed concern that his employer was going to ask him to do work at a greater exertional level than he was capable of performing. Oh physical examination, plaintiff had a full range of motion of the shoulder, elbow, and wrist. Range of motion to the thumb was also full but that of the fingers was decreased in various degrees. Sensation in the middle and ring fingers was also noted to be decreased and EMG and nerve conduction studies were pending to rule out the possibility of carpal tunnel syndrome. (Tr. pp. 169-170). Following the evaluation that day and using a prescribed formula, Dr. Kaye issued a workers' compensation rating indicating that plaintiff had a 37% permanent partial impairment of the upper extremity. (Rec. doc. 170-171). Nerve conduction studies were subsequently performed on the right upper extremity on January 23, 2007 which produced normal results. (Tr. p. 177).

On March 21, 2007, plaintiff was seen at the Ochsner emergency room for complaints of pain to the right hand, having run out of

18

his pain medication and not having seen Dr. Kaye in several months. On physical examination, plaintiff was noted to have a limited range of motion to the index, middle, and ring fingers of his right hand but motor strength was 5/5 throughout.  Plaintiff was also noted to have some bony nodules on the ventral surface of the middle and ring fingers which were possibly thought to be arthritic nodules.  The assessment was hand pain and possible arthritis to the hand.  Plaintiff was given a prescription for Ultram and was instructed to contact Dr. Kaye and to follow-up with the Rheumatology Department. (Tr. pp. 201-204).

Plaintiff was next seen by Dr. Kaye on March 23, 2007 complaining of painful nodules in his fingers, principally in the right middle finger. Range of motion to the fingers remained unchanged.  Dr. Kaye explained to plaintiff that his previous impairment rating included consideration of pain.  Plaintiff was noted to be wearing a wrist wrap which provided him some degree of relief.  While plaintiff still had some decreased sensation in the fingers, carpal tunnel syndrome had been ruled out.  X-rays taken at this time produced findings suggestive of old post-traumatic changes and interfalangeal osteoarthritis.  At the conclusion of the treatment note, Dr. Kaye remarked that he really had nothing further to offer plaintiff. (Tr. pp. 168, 175). Plaintiff returned to Dr. Kaye's office on August 21, 2007, expressing anger over the

reduction of his workers' compensation benefits prior to his current visit with the doctor. Plaintiff advised the doctor that he had not returned to work, that he could not perform any type of work, and that he was thus applying for Social Security benefits. Plaintiff complained of pain to his hand and numbness to his fingers. Another EMG and nerve conduction studies were to be scheduled to rule out the possibility of carpal tunnel syndrome or cervical radiculopathy. Plaintiff expressed further anger over the fact that workers' compensation would no longer pay for this additional testing. Dr. Kaye noted plaintiff to have excellent range of motion to his shoulder and elbow, good to excellent range of motion to the wrist, and motion of the fingers the same as before with an extension lag of the middle finger MCP joint and ability to make a competent but not absolutely normal fist. (Tr. p. 167). Plaintiff subsequently underwent the repeat testing on September 24, 2007 which again produced normal results. (Tr. pp. 162-164).

On November 29, 2008, plaintiff was consultatively evaluated by Dr. Bret Rothaermel. The chief complaints were identified as a right hand injury and diabetes. In describing the history of plaintiff's right hand injury, the doctor noted that plaintiff had not gone through any therapy following the incident. At that time, plaintiff was not seeing a physician for his right hand and was not

20

taking any prescribed medications for his pain which was described as throbbing and at a level of "9". The only relieving factor reported by plaintiff was Tylenol with aggravating factors being weather changes and worsening at night and associated symptoms including numbness to the fingers. In terms of plaintiff's diabetes, he was reportedly in good compliance with his medication regimen although he did have occasional eye blurring and dizziness when not taking his medication. Plaintiff was said to be independent with all activities of daily living, ambulation, and transfers, reportedly spending most of his time walking and exercising. On physical examination, Bouchard's and Heberden's nodes were present on plaintiff's right hand. Range of motion to the MCP joint was somewhat limited. In terms of strength, the grip of the right hand was 4/5 with normal dexterity and grasping and the grip of the left hand was 5/5. Motor strength and muscle bulk and tone were 5/5 throughout all extremities. Sensation was slightly decreased around the site of plaintiff's skin graft. Based on the results of his examination, Dr. Rothaermel diagnosed plaintiff as having a history of a right hand crush injury and skin graft with a resulting mild functional impairment and diabetes mellitus. (Tr. pp. 237-240).

Finally, on December 4, 2008 an Administration medical consultant reviewed plaintiff's file as it was then extant and set

forth her findings in a Physical Residual Functional Capacity Assessment form.  There, the medical consultant found that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; could sit, stand and/or walk for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; had no postural, manipulative, visual, or communicative limitations; and, was to avoid concentrated exposure to extreme cold and heat. Plaintiff's allegations were deemed to be only partially credible. (Tr. pp. 241-248).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on 7 separate grounds. In the first of those, plaintiff alleges that the ALJ failed to evaluate whether he had a disability of any duration such that a closed period of disability benefits should have been awarded. Plaintiff contends that the only determination that was made by the ALJ that was remotely related to duration was his statement at the conclusion of his opinion that plaintiff had not been "... under a 'disability', as defined in the Social Security Act, from November 28, 2005 through the date of this decision (20 CFR §404.1520(g))". (Rec. doc. 10-1, p. 3)(quoting Tr. at p. 13).  Plaintiff makes no suggestion of the precise dates that the closed period for which he should have been awarded benefits started and ended.

The Social Security Act defines a "disability" very

22

specifically as an inability "... to engage in any substantial gainful activity by reason of any medically determinable physical ... impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423(d)(1)(A). This is what is known as the "duration requirement". See 20 C.F.R. §404.1609. The Fifth Circuit has interpreted the duration requirement consistent with the language of the statute itself: that the inability to work must last for a continuous period of 12 months and that a condition that responds to treatment within that time period such that the claimant's ability to work is no longer seriously affected is not disabling. Johnson, 864 F.2d at 346 (citing Pate v. Heckler, 777 F.2d 1023, 1026 (5th Cir. 1985)).

Contrary to plaintiff's present assertions, the reference to duration that the ALJ made at the conclusion of his opinion was not his only pronouncement on the issue. On the first page of his opinion, the ALJ properly recited the statutory definition of disability and he thereafter noted that a claimant must meet the duration requirement to be considered disabled. (Tr. pp. 8-10). The ALJ went on to observe that plaintiff had undergone surgeries to his right hand in late 2005 and had required no additional operations nor had any been recommended. Post-operatively, participation in a work hardening program had improved the

functionality of plaintiff's hand to such an extent that his treating physician had cleared him to return to light to medium-level work in October of 2006. (Id.).  The existence of an impairment which rendered plaintiff unable to work for a continuous 12-month period is not established. See Barnhart v. Walton, 535 U.S. 212, 219-20, 122 Ct. 1265, 1270 (2002)(recognizing the Administration's own interpretation of Social Security Ruling 82-52 that it is the inability to engage in substantial gainful activity that must last the required 12-month period).  This claim is rejected.

In his second challenge to the Commissioner's decision, plaintiff argues that the ALJ failed to analyze whether he could not only obtain employment but could maintain it on 8-hour per day, 5-day per week continuous basis.

Citing Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002), plaintiff argues that the ALJ erred in not making a specific determination regarding his ability to maintain employment based on his hearing testimony that he has right hand pain that varies from day-to-day.  Whatever vitality Watson may have once had,[1] nothing

---

[1] Prior to Watson, courts had generally limited the holding in Singletary v. Bowen, 798 F.2d 818 (5th Cir. 1996) to situations in which the claimant had a serious mental impairment and sporadic work history.  Williams v. Barnhart, 00-CV-830 (E.D. La. May 31, 2001), aff'd, 31 Fed. Appx. 833 (5th Cir. 2002)(table); Buras v. Apfel, 2000 WL 1706074 at *2 (E.D. La. 2000)(quoting Leidler v.

in that opinion suggests that an ALJ must make a specific finding
regarding the claimant's ability to maintain employment in every
case and its holding has since been limited to situations in which
"... the claimant's physical ailment waxes and wanes in its
manifestation of <u>disabling</u> <u>symptoms</u>." <u>Frank v. Barnhart</u>, 326 F.3d
618, 619 (5th Cir. 2003)(emphasis added). The panel in <u>Frank</u> gave
as an example the weight of the evidence that might necessitate a
separate finding regarding a claimant's ability to maintain
employment: "[f]or example, if Frank had alleged that her
degenerative disc disease prevented her from maintaining employment
because every number of weeks she lost movement in her legs, this
would be relevant to the disability determination." <u>Id</u>.  Thus,
disability based upon diabetes, left leg pain, and osteoarthritis
was not of sufficient magnitude to require the ALJ to make a
separate finding regarding the ability to maintain employment in
<u>Sanchez v. Barnhart</u>, 75 Fed.Appx. 268, 270 (5th Cir. 2003).  For his
part, Judge Zainey has found that such a finding was required where
a claimant had an above-the-knee amputation of his right leg in
addition to chronic hepatitis, chronic pancreatitis, kidney stones,

---

<u>Sullivan</u>, 885 F.2d 291, 292-93 (5th Cir. 1989)). Since the time that
<u>Singletary</u> was handed down, the Regulations have been amended to
require the ALJ to determine whether the claimant can both obtain
and maintain employment when assessing the claimant's residual
functional capacity.  <u>Mesa v. Barnhart</u>, 253 F.Supp.2d 934, 942-43
(W.D. Tx. 2003)(citing 20 C.F.R. §404.1545(b)).

hypertension, diabetes, and depression, <u>Bickham v. Barnhart</u>, No. 01-CV-2706, 2003 WL 1460718 (E.D. La. March 20, 2003),[2]/ but that such a finding was not required based upon a claimant's hearing testimony that she had to limit her time away from home due to medication side effects.  <u>Surgi v. Barnhart</u>, No. 04-CV-0176, rec. doc. 9 at pp. 20-21, adopted at rec. doc. 11 (E.D. La. Jan. 20, 2005), <u>aff'd</u>, 168 Fed.Appx. 555 (5th Cir. 2006).

Just as in <u>Frank</u>, plaintiff does not allege that he can work for short spans of time but cannot hold a job; rather, he appears to contend that he cannot work at all.  <u>Frank</u>, 326 F.3d at 621. Plaintiff's hearing testimony, that his hand pain for which he takes only Tylenol varies from day-to-day, is not of sufficient severity to require a separate finding regarding his ability to maintain employment to the extent that such a finding was not subsumed by the ALJ's residual functional capacity ("RFC") assessment.  This claim is without merit.

In his third challenge to the Commissioner's decision, plaintiff argues that the ALJ failed to articulate a sufficient rationale for discounting his credibility, instead stating only the following:

---

[2]/ The Court notes that the Fifth Circuit's opinion on the petition for rehearing in <u>Frank</u> came down 5 days after Judge Zainey rendered his opinion in <u>Bickham</u>.

> [a]fter careful consideration of the evidence, the undesigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.
>
> (Rec. doc. 10-1, p. 6)(quoting Tr. p. 11).

In addressing plaintiff's third challenge, the Court recalls that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990).  In addition, the  law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of.  Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989).  The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced.  Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d at 621 n.4).  The evaluation of a plaintiff's subjective symptoms

27

is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.   Harrell, 862 F.2d at 480.   The ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so.   Anderson v. Sullivan, 887 F.2d 630, 633 (5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988)).

In his written decision of August 14, 2009, the ALJ first recited the proper standards by which he was to judge plaintiff's credibility, including the requirement that his subjective complaints be supported by objective medical evidence. (Tr. p. 11). After briefly summarizing plaintiff's hearing testimony, the ALJ then proceeded to weigh that testimony against the objective medical evidence of record. (Tr. pp. 11-12).   As compared with plaintiff's testimony that he was unable to work due to severe right hand and finger pain as well as back pain, the ALJ noted that except for plaintiff's surgeries in 2005, he had not required any additional operations nor had any been recommended.   Post-operatively, the ALJ observed, plaintiff had completed a work hardening program that had improved the functionality of his right hand such that his treating physician had released him to return to light to medium-level work in October of 2006.   While plaintiff had

28

finger nodes and arthritis, plaintiff's testimony regarding the limitations resulting therefrom was undercut by the fact that he had received very little treatment for his hand since 2007. Despite plaintiff's complaints of hand numbness, the ALJ pointed to the results of the serial EMG and nerve conduction studies which had been normal. (Tr. p. 11).

Continuing on through his analysis, the ALJ noted that plaintiff's testimony regarding extensive limitations with the use of his right hand was at odds with the results of the consultative evaluation which indicated that he had only a mild functional impairment. The ALJ further observed that the use of only over-the-counter medication for pain was inconsistent with someone who was experiencing a disabling level of pain, an appropriate consideration in the credibility assessment process. Jones, 702 F.2d at 622. Given that plaintiff had obtained no treatment for his back, the ALJ was also fully justified in discounting plaintiff's testimony regarding any limitations resulting therefrom. Id. Likewise, the objective medical evidence failed to support plaintiff's allegation of medication side effects. (Tr. p. 12). Not only had no doctor declared that plaintiff was unable to work for a continuous 12-month period, his treating physician had actually encouraged him to return to work, albeit at an exertional level less than heavy. See Leggett v. Chater, 67 F.3d 558, 565 (5th

29

Cir. 1995).   As for plaintiff's diabetes, such is generally considered to be a remediable condition in the Fifth Circuit. Jones, 829 F.2d at 527-28.

Finally, the ALJ properly considered the activities that plaintiff testified that he was capable of in making the disability determination.   Leggett, 67 F.3d at 565 n. 12. In that regard, the Court notes that in a Function Report that was completed on plaintiff's behalf on October 10, 2008, it was reported that he had no use whatsoever of his right hand, was unable to prepare meals, and was unable to drive because he could not control the steering wheel with only his left hand. (Tr. pp. 109-117).   Yet plaintiff was able to drive himself to the administrative hearing at which he testified to only occasional problems with gripping the steering wheel with his right hand, that he was able to drive using his left hand alone, and that he drove half of the days in any given month. (Tr. pp. 20-21).   When initially asked if he could cook, plaintiff answered in the negative but then testified that he could make sandwiches and operate a microwave oven.   Similarly, when asked who did the household chores, laundry, and shopping, plaintiff testified that his fiancé performed such tasks but when pressed he admitted that he could do so if he had to, the primary limiting factor being pain with lifting. (Tr. pp. 27-28).   Subjective testimony and complaints do not take precedence over objective

medical evidence.  That was essentially the reason cited by the ALJ for giving plaintiff's testimony the weight that he did. (Tr. pp. 11-12).  That fulfills his duty here.  <u>Godbolt v. Apfel</u>, 1999 WL 179476 at *9 (E.D. La. March 31, 1999)(citing <u>Falco v. Shalala</u>, 27 F.3d 160, 164 (5th Cir. 1994)).  <u>See</u> <u>also</u> <u>Augustine v. Barnhart</u>, 2002 WL 927797 at *4 (E.D. La. May 7, 2002); <u>Collins v. Callahan</u>, 1998 WL 118082 at *3-4 (E.D. La. March 17, 1998).

In his fourth challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to give proper consideration to the effects of his manipulative limitations.  Based on the testimony that he gave at the administrative hearing and Dr. Kaye's workers' compensation impairment rating, plaintiff argues that he has limitations with his right hand that are far greater than just fine manipulation and that the VE's answer to the hypothetical question posed by the ALJ which included only that limitation fails to provide substantial evidence to support the ALJ's decision.

Having properly found, at step 3 of the 5-step sequential analysis, that plaintiff's conditions did not meet the criteria of any of those set forth in the Listing of Impairments, the ALJ made an assessment of plaintiff's residual functional capacity ("RFC") which is defined as what a claimant can still do despite his limitations.  20 C.F.R. §§404.1520(e), 404.1545.  It was essentially that RFC assessment that the ALJ incorporated into his

31

hypothetical question to the VE.  In the Fifth Circuit, the test

for determining when a defective hypothetical question to a VE

constitutes reversible error is as follows:

> [u]nless the hypothetical question posed to the
> vocational expert by the ALJ can be said to incorporate
> reasonably all disabilities of the claimant recognized by
> the ALJ, and the claimant or his representative is
> afforded the opportunity to correct deficiencies in the
> ALJ's question by mentioning or suggesting to the
> vocational expert any purported defects in the
> hypothetical questions (including additional disabilities
> not recognized by the ALJ's findings and disabilities
> recognized but omitted from the question), a
> determination of non-disability based on such a defective
> question cannot stand.

> Bowling v. Shalala, 36
> F.3d 431, 436 (5th Cir.
> 1994).

Faced with the evidence before him, the ALJ assessed plaintiff

as being capable of light level work with postural maneuvers being

done only frequently, no fine manipulation with the right hand, and

avoidance of concentrated exposure to heat and cold.  That

assessment was more restrictive than the opinion of plaintiff's

treating physician who had cleared him to return to light to

medium-level work with no additional limitations to the right upper

extremity.  The workers' compensation impairment rating that was

arrived at by Dr. Kaye was based on a formula and produced a result

that is not binding upon the Commissioner.  Johnson v. Sullivan,

894 F.2d 683, 686 (5th Cir. 1990).  Despite plaintiff's complaints

of right hand numbness, repeat EMG and nerve conduction studies were normal.  The consultative evaluator categorized plaintiff's right hand condition as only a mild functional impairment and plaintiff had 4/5 grip strength with normal dexterity and only slightly decreased sensation.  The Administration's medical consultant, after reviewing the foregoing evidence, found that plaintiff was capable of medium-level work and had no manipulative limitations whatsoever, a more generous assessment than what was arrived at by the ALJ and incorporated into his hypothetical question to the VE.  When pressed by the ALJ, plaintiff testified that he could perform a range of routine daily activities if he had to.  Because the Court believes that he ALJ's RFC assessment was a correct one, he was under no obligation to include in the hypothetical question testimony of subjective complaints and limitations which lacked objective support.  <u>Morris v. Bowen</u>, 864 F.2d 333, 336 (5th Cir. 1988).

Finally, plaintiff characterizes as "palpably incredible" the VE's testimony that even a marked restriction in the use of the right hand would not erode the available occupational base of the jobs that she had identified.  As aptly noted by the Commissioner, even a below-the-elbow amputation and an impairment in the functioning of a leg do not necessarily render a claimant unable to perform light-level work.  <u>Carey v. Apfel</u>, 230 F.3d 131, 147 (5th

Cir. 2000); see also Robinson v. Celebrezze, 326 F.2d 840 (5th Cir.), cert. denied, 379 U.S. 951, 85 S.Ct. 98 (1964)(claimant who had lost right arm at shoulder was not disabled).[3] This claim is rejected.

Plaintiff's fifth challenge to the Commissioner's decision is that the Commissioner failed to sustain his burden at the fifth step of the sequential evaluation that there is other work available in the national economy that he can perform in light of his age, education, work experience, and physical limitations.

This challenge is essentially a reiteration of plaintiff's previous arguments attacking the correctness of the ALJ's RFC assessment and the incorporation of that assessment into the hypothetical question that was posed to the VE.  For present purposes, suffice it to say that plaintiff's own treating physician had cleared him to return to light to medium-level work within 1 year of his workplace injury, the consultative evaluator found plaintiff to have 5/5 strength throughout all extremities, and the Administration's medical consultant, after reviewing that evidence, concluded that plaintiff was capable of up to medium-level work. After discharging plaintiff from his care, Dr. Kaye refused to

---

[3] The Court further notes that disability is presumptively established only by the loss of both hands.  Listing 1.05, 20 C.F.R. Part 404, Subpt. P, App. 1.

prescribe any additional pain medication which points to the conclusion that the doctor did not believe that there was an objective basis for plaintiff's complaints. The hypothetical question to the VE reasonably incorporated all of plaintiff's limitations that were recognized by the ALJ. Bowling, 36 F.3d at 436. Plaintiff had obtained very little, if any, treatment for his hand in the years preceding the administrative hearing, he took only Tylenol for pain relief, and he was indeed capable of performing a wide range of activities. Plaintiff provides no elaboration on the reported postural and communicative limitations he references on page 11 of his supporting memorandum and the Court can find no evidence of any such limitations. The VE's answer to the ALJ's hypothetical question satisfied the Commissioner's burden at the fifth step and that burden has not been rebutted here. Masterson v. Barnhart, 309 F.3d 267, 273 (5th Cir. 2001); Fraga, 810 F.2d at 1304. This challenge provides no basis for relief.

In his sixth challenge to the Commissioner's decision, plaintiff argues that the ALJ, in violation of Social Security Ruling ("SSR") 00-4p, failed to ask the VE about potential conflicts between her testimony and the job descriptions set forth in the Dictionary of Occupational Titles ("DOT").

Social Security Ruling 00-4p provides that an ALJ should identify and obtain an explanation for any conflicts between a VE's

testimony and the DOT and to explain in his or her decision how any identified conflicts were resolved.  <u>Barratt v. Astrue</u>, 2008 WL 2325636 at *1 n. 1 (5th Cir. 2008).  "When the claimant suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ <u>may</u> rely exclusively on the [Medical-Vocational] Guidelines in determining whether there is other work available that the claimant can perform."  <u>Selders</u>, 914 F.2d at 618 (emphasis added). "Otherwise, the ALJ <u>must</u> rely upon vocational testimony or other similar evidence to establish that such jobs exist."  <u>Fraga</u>, 810 F.2d at 1304 (citing <u>Lawler</u>, 761 F.2d at 198)(emphasis added). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." <u>Fields v. Bowen</u>, 805 F.2d 1168, 1170 (5th Cir. 1985).  "A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job." <u>Id</u>.

Recognizing that the DOT is not comprehensive, because it cannot and does not purport to include each and every specific skill and qualification for a particular job, the Fifth Circuit in <u>Fields</u> even went so far as to conclude that the DOT is not "similar evidence" that would satisfy the Commissioner's burden of proof at

the fifth step of the sequential analysis.  <u>Fields</u>, 805 F.2d at 1170-71.  "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job."  <u>Carey</u>, 230 F.3d at 145.  An ALJ may rely upon the testimony of a vocational expert provided that the record reflects an adequate basis for doing so.  <u>Id</u>. at 146.  "Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing."  <u>Id</u>. at 146-47.

In the matter at hand, just as in <u>Carey</u>, the ALJ found that plaintiff additionally suffered from non-exertional impairments in the form of being capable of postural maneuvers only frequently, a lack of fine manipulation with the right hand, and the need to avoid constant exposure to heat and cold.  That being the case, the ALJ was required to utilize the services of a VE to establish that there was other work available that plaintiff could perform.  And, just like <u>Carey</u>, plaintiff's counsel was given an opportunity to cross-examine the VE about any conflicts between the requirements of the jobs she identified at the hearing and the descriptions of

those jobs as contained within the DOT. Carey, 230 F.3d at 146-47. However, unlike the claimants in Carey and Barratt, plaintiff makes no suggestion as to what the alleged conflict(s) between the VE's testimony and the DOT is. Having failed to do so, plaintiff has not shown that he was prejudiced by what is nothing more than a technical violation of SSR 00-4p. Barratt, 2008 WL 2325636 at *1 n. 1. This claim is rejected.

Plaintiff's seventh and final challenge to the Commissioner's decision is that there is a lack of substantial evidence supporting the conclusion that there are a "significant numbers" of jobs that he can perform.

The Court agrees with plaintiff that the Fifth Circuit has not established any bright-line rule as to what constitutes a "significant number" of jobs for purposes of step 5 of the sequential analysis. It recognized as much in Monroe v. Shalala, 55 F.3d 533, 1995 WL 313965 at *8 (5th Cir. 1995) but went on to adopt the reasoning of the Tenth and Sixth Circuits in Trimiar v. Sullivan, 966 F.2d 1326 (10th Cir. 1992) and Hall v. Bowen, 837 F.2d 272 (6th Cir. 1988) which had respectively found that 650 to 900 and 1,350 jobs within a state amounted to a "significant number" of jobs sufficient to sustain the Commissioner's burden. Thus, the panel in Monroe found that the existence of 997 weigh scale operator positions and 2,262 alarm monitor positions in the

Louisiana economy was sufficient. <u>Id</u>.  Indeed, in <u>Denais v. Sec. of</u>
<u>Health & Human Services</u>, 820 F.Supp. 278, 282-83 (W.D. La. 1993),
1,004 jobs was found to be a "significant number" although
plaintiff successfully rebutted the evidence that she could perform
them.  More recently, the United States District Court for the
Western District of Louisiana has noted that even as little as a
few hundred jobs in a small state such as Louisiana was
significant.  <u>O.D.W. v. U.S. Comm'r. Soc. Sec. Adm.</u>, 2009 WL
5108393 at *2 (W.D. La. Dec. 17, 2009); <u>March v. U.S. Comm'r. Soc.</u>
<u>Sec. Adm.</u>, 2008 WL 5273725 at *4 (W.D. La. Dec. 16, 2008).  The VE
in the present case identified a cumulative total of 9,000 jobs in
the state that plaintiff could perform. (Tr. p. 37).  In light of
the authorities cited above, the Court readily concludes that such
constitutes a "significant number" sufficient to sustain the
Commissioner's burden.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is recommended that plaintiff's
motion for summary judgment be denied and that defendant's motion
for summary judgment be granted.

A party's failure to file written objections to the proposed
findings, conclusions, and recommendation contained in a magistrate
judge's report and recommendation within 14 days after being served
with a copy shall bar that party, except upon grounds of plain
error, from attacking on appeal the unobjected-to proposed factual

findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>24th</u> day of _____ June _____, 2011.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE